Petition of Milton BINSTOCK, as owner of the PLEASURE CRAFT INA B II, in a cause of limitation of and exoneration from liability.

United States District Court
S. D. New York.
Feb. 13, 1963.

Macklin, Speer, Hanan & McKernan, New York City, Gerald J. McKernan, James M. Leonard, New York City, of counsel, for petitioner.

Bernard Ekstein, New York City, Paul Cherin, New York City, of counsel, for claimant, Dolores Glassberg.

Bigham, Englar, Jones & Houston, New York City, John L. Quinlan, New York City, of counsel, in defense of claim against Estate of Samuel Glassberg.

Sidney J. Leshin, New York City, and Baker, Garber & Chazen, Hoboken, N. J., Nathan Baker, Milton Garber, Hoboken, N. J., of counsel, for claimant, Mildred Friedman.

Dougherty, Ryan, Mahoney & Pellegrino, New York City, Lawrence J. Mahoney, New York City, of counsel, in defense of claim against Estate of Murray Friedman.

Haight, Gardner, Poor & Havens, New York City, James Estabrook, New York City, of counsel, in defense of claim against Estate of Murray Friedman.

CASHIN, District Judge.

Milton Binstock, as owner of the Pleasure Craft INA B II, has filed a petition, pursuant to 46 U.S.C. § 183 et seq., seeking exoneration from or limitation of liability for damages asserted by the claimants as a result of the deaths of Samuel Glassberg and Murray Friedman. The claimants are Dolores Glassberg, Executrix of the Estate of Samuel Glassberg, and Mildred Friedman, Executrix of the Estate of Murray Friedman.

I find that the petitioner, Milton Binstock, purchased the INA B II, a 30'6" Owens cabin cruiser, in late 1956 or early 1957. The INA B II was equipped with twin 136 h. p. Owens flagship engines, and was new when purchased. It was delivered to petitioner in late April or early May of 1957. The INA B II was berthed, serviced and maintained at Winter's Yacht Basin, Mantoloking, New Jersey, until October 26, 1958.

It is agreed by the petitioner and the claimants that during the late summer and early fall of 1958 the petitioner had been negotiating with one Samuel Glassberg, a business acquaintance of petitioner's, for the sale to him of the vessel.

I find that in late September of 1958, petitioner proceeded to Mantoloking, New Jersey, with Samuel Glassberg, to give Glassberg an opportunity to inspect the INA B II as she lay in the water alongside Winter's dock. Murray Friedman, also a business acquaintance of petitioner's and a friend of Samuel Glassberg, accompanied petitioner and Glassberg to Mantoloking, together with Friedman's young son. Petitioner opened all the hatches, uncovered the engines and pointed out all navigational equipment. The inspection took about an hour and included starting and running of the engine though the boat did not actually get under way.

On October 26, 1958, the petitioner agreed to permit Samuel Glassberg to take the vessel for examination of its engines by someone of Glassberg's choice in prospect of a future purchase of the boat. At about 6:30 A.M. on the morning of Sunday, October 26, 1958, petitioner arrived by car at Howard Johnson's Restaurant on the Garden State Parkway in New Jersey and there met Samuel Glassberg, Murray Friedman, Lawrence Glassberg (the 18 year old son of Samuel Glassberg) and a fourth individual, Cyril Waldman (a man never previously met by Binstock).

The entire group departed for Winter's Yacht Basin in Glassberg's car. Upon arriving at Winter's at Mantoloking, the weather was cold and there was a light rain. The group boarded the INA B II, the engines were started and the ship-to shore radio put on. About forty-five minutes of demonstration were given. A decision was made not to take the boat out at that time because of the state of the weather.

The group then entered upon the Garden State Parkway and proceeded along it in a northerly direction. En route it appeared that the weather was clearing. The group then proceeded to the beach front at Asbury Park, New Jersey, where they stopped off to observe the weather and sea conditions firsthand. From the boardwalk at Asbury Park it was noted that the rain had stopped and the sun was either shining or attempting to break through the clouds.

The group then entered the Berkeley-Carteret Hotel in Asbury Park and Samuel Glassberg entered a phone booth to call the Coast Guard. Lawrence Glassberg, upon the trial of this case, testified that Milton Binstock subsequently entered the phone booth and that Binstock also engaged in conversation on the phone. This testimony I reject as unworthy of belief. Claimants' own witness, Joseph Sulewski, the Coast Guardsman on telephone duty at Manasquan Inlet, (and the one to whom the claimants asserted the telephone call was directed) asserted that he had spoken to but one person during this call. Milton Binstock denies having spoken on the telephone. I find that the telephone call made from the lobby of the Berkeley-Carteret Hotel was made by Samuel Glassberg alone and that Milton Binstock did not participate in it.

Mr. Sulewski testified to having received a telephone inquiry that morning concerning weather conditions but he could not identify the caller. In accordance with Coast Guard standing orders, the Coast Guardsman, in giving weather conditions, would not give opinions in regard to inquiries whether or not boats should go out or stay in under certain weather conditions. There was testimony by Glassberg's son, which was denied by the petitioner, that after Binstock allegedly spoke on the telephone, Binstock said: "You can take the boat." I reject this testimony.

I find that following the telephone call, the men left Asbury Park. The party, still in Glassberg's car, proceeded to Manasquan Inlet where they observed the condition of that body of water. Since Lawrence Glassberg was not to go on the voyage but was to pick up Milton Binstock, subsequently, petitioner pointed out to Lawrence Glassberg a meeting place where he was to be picked up upon leaving the INA B II.

The group then proceeded to Mantoloking, New Jersey, and Binstock, Samuel Glassberg, Murray Friedman and Cyril Waldman boarded the INA B II. Lawrence Glassberg, in his father's car, drove to Manasquan Inlet where he was to meet the INA B II later and pick up the petitioner.

The INA B II proceeded from Mantoloking, New Jersey, to Manasquan Inlet. Petitioner had the wheel of the vessel as it left the boat basin, and also took the wheel to dock the vessel at Manasquan Inlet. Upon arrival at the Inlet, Binstock steered the vessel alongside a dock on the southern shore. There Milton Binstock debarked.

The INA B II proceeded out the mouth of the Manasquan Inlet, with Samuel Glassberg at the helm, and with Friedman and Waldman aboard; it then turned to a roughly northeasterly heading.

I find that custody and control of the INA B II at Manasquan Inlet, when petitioner left the vessel, was given to Samuel Glassberg in connection with a proposed examination which he was to have a representative of his choice make of the INA B II in prospect of a future purchase of the boat. The petitioner at all times pertinent hereto was and remained the owner of the vessel. The petitioner gave permission to Samuel Glassberg to take the vessel to the Bergen Beach Yacht Club, Brooklyn, New York, at which place Lawrence Glassberg was to meet his father at 4 o'clock that afternoon.

There is no evidence as to how long Glassberg stayed at the controls nor who was at the controls at the time of the foundering.

Coast Guardsman Sulewski was on duty at the Coast Guard Tower and

logged the INA B II out of the Inlet at 11:15 A.M. She headed seaward and then in a northeasterly direction. She was last seen three to four miles away.

The vessel never arrived at Bergen Beach. The INA B II became overdue and, after the Coast Guard was notified, a search was initiated. On the following day, October 27, 1958, the INA B II was discovered at 8:45 A.M. in a semi-sunken condition at a position due east from Shark River Inlet, approximately 3.7 miles off the New Jersey coast. At 10:17 A.M. the dead body of Cyril Waldman, clad in an orange life jacket, was found approximately 6.2 miles from Shark River Inlet at 083 degrees true. No one was aboard the INA B II. The vessel was towed to St. George, Staten Island. No trace of either Samuel Glassberg or Murray Friedman has ever been discovered. From all the relevant facts and circumstances disclosed by the evidence, the only reasonable conclusion is that they too met their death.

Samuel Glassberg was a boatsman of considerable experience. He had owned craft both larger and smaller than the INA B II. Murray Friedman was also an experienced boatsman, having been observed by one of claimants' witnesses to have operated one of Samuel Glassberg's boats about half the underway time. In addition, it was admitted that Murray Friedman had a half ownership in a pleasure craft owned by Glassberg.

Petitioner had personally observed Samuel Glassberg handle the INA B II during the forty minute trip between Mantoloking and Manasquan on October 26, 1958. Glassberg showed that he was at home with the boat and that he knew what he was doing. Prior to that, both Glassberg and Friedman had evidenced familiarity with boats, their gear and appurtenances. I find that both Glassberg and Friedman were experienced and competent boat operators and that petitioner, Milton Binstock, had a right to rely on their skill.

The United States Coast Guard maintained a weather observation station at Manasquan Inlet. The log entries of this station with regard to the actual conditions existing at the Inlet were introduced into evidence. These log entries show, and I find to be a fact, that the following conditions existed:

Midnight: The wind force was 7 (28 to 33 mph. on the Beaufort Scale—a "high wind"), it was raining, visibility was 5 miles and the sea was "rough".

0400 (4 a. m.): The wind force had declined to 6 (22 to 27 mph. on the Beaufort Scale—a "strong breeze").

0800 (8 a. m.): The wind force had declined to 5 (17 to 21 mph. on the Beaufort Scale—a "fresh breeze") and visibility had improved to 6 miles.

1200 (Noon): The wind force had declined to 4 (11 to 16 mph. on the Beaufort Scale—a "moderate breeze"). Visibility had improved to 7 miles, the rain had stopped and the seas had become moderate.

1600 (4 p. m.): The wind force had declined further to 2 (6 miles or under per hour—a "light breeze") and the skies were clear.

█ There was, of course, a conflict in testimony between claimants' expert, Roy Osborn, and petitioner's expert, John Aitken, as to the propriety of undertaking a voyage between Manasquan Inlet and Bergen Beach under the conditions obtaining on October 26, 1958. Neither had any knowledge of conditions obtaining on the date in question other than was furnished them by respective proctors. I reject the testimony of Roy Osborn inasmuch as it was based upon an erroneous assumption that considerably stronger wind conditions existed at the time of the INA B II's departure from Manasquan Inlet. Thus, Osborn's testimony is without foundation. I accept the testimony of John Aitken insofar as he stated that the operation of a thirty foot boat, such as the INA B II, under the existing wind and sea conditions, was fully consistent with prudent seamanship.

Although small boat warning flags were flying at the time the INA B II departed Manasquan, I find that the flying of such flags was based upon a large scale weather forecast which did not reflect actually obtaining conditions in the area over which the INA B II was to traverse. I find that the actual weather conditions obtaining in and around Manasquan and related waters had represented a fast diminishing local condition which had moderated at the time of the departure of the INA B II and moderated even further thereafter.

I find that petitioner, Milton Binstock, had no actual knowledge of the small craft warning flags flying at the United States Coast Guard Station at Manasquan Inlet.

The claimants assert several faults with respect to the condition of the INA B II at the time it departed from Manasquan Inlet. I find, however, that the conditions of damage exhibited by the INA B II subsequent to the casualty did not pre-exist the departure of that vessel from Manasquan Inlet on October 26, 1958.

A portion of the transom of the vessel was produced in court. It was made of mahogany. The portion produced in court was the lowest plank of the transom, which is the stern of the vessel; the plank was broken in two sections. This portion of the transom had been removed from the vessel after it was recovered. The lower part of the plank was removed by removing the screws that held it to the bottom of the boat. The upper section was cut off at each end about three or four inches from each side. The court made observation of the two pieces of the plank. In connection with the court's examination of the removed section of the transom, the court also had the benefit of a photograph of the stern section of the vessel taken by the Coast Guard after the vessel's recovery.

Claimants' proctors introduced expert testimony to the effect that the split transom plank of the INA B II showed evidences of a crack into which caulking material had been placed. Claimants'

witness admitted that the INA B II bore no marks of having been caulked with a caulking iron or other instrument. He asserted, however, that it was "possible" for caulking to have been inserted without leaving such marks, possibly by a highly skilled carpenter's utilization of an admittedly very unusual procedure. I cannot believe that such actually occurred here, especially since the ordinary and proper facilities for a caulking job would have been readily available. In addition, a chemical analysis of the material asserted by claimants' witness to be caulking disclosed that it was a chemical wood pulp such as is contained in paper. Photographs were introduced of the INA B II showing the entire after interior of the boat littered with various paper products. I find, therefore, that the material which was described by claimants' expert as caulking was, in effect, particles of paper which had become lodged in the crack in the transom plank of the INA B II after the casualty.

I accept the testimony of petitioner's experts to the effect that the crack in the transom plank was caused by the unnatural strain placed upon the INA B II when she was lifted out of the water subsequent to the casualty. The entire after end of the boat was filled with water and produced a condition of strain far in excess of her construction specification.

I find, on the basis of unrebutted testimony by petitioner and by the owner of the yacht yard at which the INA B II was kept, that the vessel was accorded all care that might be reasonably expected of it. I find that the INA B II was equipped with a ship-to-shore radio, adequate life preservers, a satisfactory bilge pump and a depth finder, and that it had been inspected by the United States Coast Guard auxiliary and found to be in a seaworthy condition.

I further find that there has been no proof of any defect or improper condition with respect to the INA B II which could have caused or contributed to the foundering of that vessel and which pre-existed the departure of that craft from Manasquan Inlet on October 26, 1958.

I find that the weather conditions as they were observable at Manasquan Inlet, at Mantoloking, New Jersey, and at Asbury Park, were observable equally by Glassberg, Friedman and petitioner. All sources of information with respect to the conditions obtaining were accessible to all alike. Petitioner had no greater knowledge of conditions affecting the propriety of the voyage than did Glassberg or Friedman.

No representation was made by petitioner as to existing or future weather conditions. The decision to undertake the voyage was that of Samuel Glassberg and Murray Friedman.

Since I have found as a fact that the existing weather and sea conditions were suitable for the proposed voyage of the INA B II, it is not absolutely necessary to pass upon the legal effect of the mutual rights and duties as among Binstock, Glassberg and Friedman. But, even if I had been persuaded that the weather conditions obtaining between Manasquan Inlet and Bergen Beach, Brooklyn, N.Y. on October 26, 1958 were such as to dissuade a reasonably prudent yachtsman from undertaking the voyage, I could not in any event find for the claimants.

■ It is not possible to determine the matter with exactitude, but the facts indicate that the occurrence certainly took place beyond a marine league from the New Jersey coast line and a number of leagues beyond the boundary of New York. Therefore, since the loss of the INA B II occurred on the high seas beyond a marine league, the Death on the High Seas by Wrongful Act statute applies. 46 U.S.C. § 761; Echavarria v. Atlantic & Caribbean Steam Nav. Co., 10 F.Supp. 677 (E.D.N.Y.1935). Under the Death on the High Seas by Wrongful Act statute the personal representative of the decedent may recover upon establishing that the death of the person injured in the accident was caused by the "wrongful act, neglect, or default" of the one against whom claim is made. 46 U.S.C. § 761. Thus, it is claimants' burden to show that the two deaths here

involved were occasioned as the result of some breach of a legal duty owed by the petitioner to claimants' decedents. The Black Gull, 82 F.2d 758 (2 Cir. 1936), cert. denied, 298 U.S. 684, 56 S.Ct. 954, 80 L.Ed. 1404.

■ There has been no such showing here. I have found that such perils as may have existed were equally apparent to and cognizable by Glassberg, Friedman and the petitioner. Even assuming that the danger were such as to inhibit a reasonably prudent yachtsman from taking the INA B II out on that date, then it must be observed that the claimants' decedents were under no compulsion to take the trip at all. As was stated in Murphy v. Steeplechase Amusement Co., 250 N.Y. 479, 483, 166 N.E. 173, 174 (1929): "The timorous may stay at home." I agree with petitioner that in the case at bar Chief Judge Cardozo's observation is just as valid upon salt water as upon dry land.

In view of the considerable skill possessed by decedents, Glassberg and Friedman, it cannot be said that the petitioner breached any duty or was in any way negligent in entrusting the INA B II to them.

I find no merit to the assertions by claimants that petitioner breached a duty to warn of the existing weather conditions. The petitioner in the case at bar was not under a duty to supply a warning as to weather conditions of which the claimants' decedents were already aware, especially since petitioner knew no more about such conditions than did the decedents. See Hamilton v. Nassau, 131 F. Supp. 125 (S.D.N.Y.1955); Moses v. Compagnie Generale Transatlantique, 16 F.Supp. 197 (E.D.N.Y.1936); Armstrong v. Winnepeg, 5 F.Supp. 469, 1933 A.M.C. 1528 (N.D.Cal.1933); McKay v. S.S. Empress of Scotland, 1926 A.M.C. 348 (S.D.N.Y.1926).

Claimants in their briefs have placed much emphasis on the decision of the United States Supreme Court in Spencer Kellogg & Sons, Inc. v. Hicks, 285 U.S. 502, 52 S.Ct. 450, 76 L.Ed. 903 (1932).

That decision is not applicable here, however, due to the fundamental differences in the factual circumstances existing in that case. There the petitioner was a corporation which operated a motor launch to ferry its employees to a factory on the New Jersey side of the Hudson River; some passengers were drowned or injured when the launch sank upon colliding with floating ice. The launch was known to be unseaworthy when ice was in the river. Limitation of liability was refused, the court holding that the accident occurred with the "privity or knowledge" of the corporate petitioner. But in that case there was no indication that any of the passengers knew or had the experience or competence to know of the perils presented by the threatening weather conditions. Operation and control of the vessel were completely vested in the petitioner.

In the instant case, however, the claimants' decedents were knowledgeable men and were fully cognizant of the perils involved. Each party stood on an equal footing. That the claimants' decedents chose of their own volition to undertake a trip in the face of weather conditions now asserted to be questionable, cannot be used as a basis for the fixing of liability upon a third party. See, Scheiner v. St. Jovite, 180 F.Supp. 452 (N.D.Cal.1960); Eytinge v. Berri, 1936 A.M.C. 1699 (S.D.N.Y.1936).

There has been no proof of negligence of the petitioner. I find the petitioner guilty of no breach of duty with respect to claimants' decedents.

■ The petitioner has adequately discharged the burden of proving the absence of "privity or knowledge" of the cause of the tragedy herein.

I, therefore, grant the petition for exoneration from all liability for any damages in connection with the claims herein asserted.

■■ I come now to the two remaining claims endeavored to be asserted:

(1) the claim asserted by claimant Mildred Friedman against the Glassberg Estate;

(2) the claim asserted by claimant Dolores Glassberg against the Friedman Estate.

It is conceded by all parties concerned that, although state court suits have been instituted in Kings County Supreme Court, none of these claims has ever been formally filed in the Federal Court. In fact, although the foundering of the INA B II occurred in October 1958, no such claims were ever even mentioned or asserted in this limitation proceeding until February 1962, when at the final of many meetings by counsel with the Pre-Trial Examiner, claims were inserted into the pre-trial order. The date of the pre-trial order was in any event more than two years subsequent to the date on which the involved occurrence took place; consequently, such claims would be time barred. Moreover, even accepting the argument that, by virtue of the provisions of the pre-trial order which the parties signed, they thereby consented to a determination of these claims in this limitation proceeding, I find that on the basis of the evidence adduced at the trial the claims must be dismissed for failure of proof. It would be pure speculation to determine who was at the helm or who was navigating the INA B II at the time it took on water; in like manner, it is impossible to determine what actually took place aboard the vessel, what proximately caused the tragedy, or which of the parties aboard was responsible therefor.

The claims are dismissed.

■ The above shall constitute my Findings of Fact and Conclusions of Law. During the course of the trial, motions were made to strike from the record certain testimony relating to certain conversations with the deceased; at that time I admitted such testimony subject, however, to my ruling on the motions that the testimony be stricken. The motions to strike such testimony are granted. Therefore, such testimony has not been considered by me in arriving at the findings of fact as hereinbefore found.

Submit decree.